Alphonso MATTHEWS, Plaintiff,

v.

NORTH SLOPE BOROUGH, Defendant.

No. A84–581 CIV.

United States District Court,
D. Alaska.

Dec. 31, 1986.

See also, 646 F.Supp. 943.

M. Ashley Dickerson, Inc., Anchorage, Alaska, for plaintiff.

David Shimek, Anchorage, Alaska, for defendant.

## DECISION—FINDINGS OF FACT AND CONCLUSIONS OF LAW

KLEINFELD, District Judge.

This case was tried by the court without a jury beginning November 10 and concluding November 12, 1986.

The complaint alleges that the plaintiff was not given the same opportunities as persons who were not black, and that he was reprimanded and denied any future promotional opportunities when he reported discrepancies in his pay. His first claim for relief alleges that his termination was an act of discrimination on the basis of race in violation of 42 U.S.C. § 2000e–2. His third claim for relief alleges that opportunities for advancement and other conduct amounted to retaliatory action in violation of 42 U.S.C. § 2000e–3.

A critical portion of plaintiff's complaint alleges that:

7. Although plaintiff performed the work related to laborer satisfactorily, and, in fact, had exemplary attendance and was in all respects a good employee, the NSB and its officers, agents, and employees continually harassed plaintiff during the course of his employment because of his race. Plaintiff was subjected to verbal abuse, threats of firing, and threats of retaliatory action when he questioned abuse of authority by his superiors. Plaintiff was not paid in accordance with Borough policy, and was subjected to differential treatment than other non-black employees.

These are the two federal statutes upon which jurisdiction is based:

2000e–2 Discrimination because of race, color, religion, sex or national origin

(a) Employers

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; . . . .

2000e–3 Other Unlawful Employment Practices

(a) Discrimination on account of opposition to unlawful practices or participation in investigation, proceeding or hearing.

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

Mr. Matthews presented no evidence that he had participated in a Title VII proceeding prior to his difficulties with the North Slope Borough. His retaliation theory appears to be that he was punished by the North Slope Borough for protesting his differential in pay, and that the differential in pay was a Title VII violation.

The leading case on employment discrimination by race under Title VII is *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The case involved a refusal to rehire, not a termination, but has been held to apply, with modification as necessary, to terminations. *McDonnell* holds that the complainant in a Title VII trial must establish a prima facie case by showing four things: (1) that he belongs to racial minority; (2) that he applied and was qualified for a job for which the employer sought applicants; (3) that despite his qualifications he was rejected; and (4) after his rejection the position remained open and the employer continued to seek applicants from persons with the same qualifications. 411 U.S. at 803, 93 S.Ct. at 1824. Once this prima facie case is established, the burden shifts to the employer to articulate some legitimate nondiscriminatory reason for the employee's rejection. The complainant then may show that the employer's reason is a mere pretext for prohibited racial discrimination. *Id.*

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the *McDonnell Douglas* criteria were applied in a sex discrimination case alleging wrongful denial of a promotion and wrongful termination. The question before the court was whether, after the plaintiff proves a prima facie case, the burden of proof or burden of persuasion shifts. The Supreme Court held that the burden does not shift, but that it remains upon the plaintiff to establish that the defendant "intentionally discriminated." The employer need only produce "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." 450 U.S. at 258, 101 S.Ct. at 1096. Erroneous judgment by the employer goes only to the issue of whether his nondiscriminatory reason was a pretext for racial discrimination. "The fact that a court may think the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretext for discrimination." *Id.* at 260, 101 S.Ct. at 1097. The court does not act as a personnel review board to decide whether the employer made the wisest personnel decision in the circumstances.

■ Where a plaintiff claims intentional racial discrimination, the "disparate treatment model" is applied, rather than the "disparate impact" model. *Hagans v. Clark*, 752 F.2d 477 (9th Cir.1985). In *Hagans* the court emphasized that whatever reformulation of *McDonnell-Douglas* was used, the district court must, in the end, determine whether the evidence is " 'sufficient to create an inference that sex was the likely reason for denial of the job opportunity' ". 752 F.2d at 483 (quoting from *Hagans v. Andrus*, 651 F.2d 622, 626 (9th Cir.1981)). Applying that formulation to the case at bar, the question is whether, in the end, race was the likely reason for a lower rate of compensation paid to the plaintiff for certain duties and for his termination.

*Sakellar v. Lockheed Missiles & Space Co.*, 765 F.2d 1453, 1456 (9th Cir.1985) explains that:

> If a defendant offers a legitimate, nondiscriminatory basis for its employment decision, whether the plaintiff actually made out a prima facie case is not relevant. As long as the plaintiff has an adequate opportunity to demonstrate that an employer's proffered reasons were not the true reasons for an employment decision, the court can proceed with the ultimate factual inquiry—did the defendant discriminate against the plaintiff? [citations omitted].

The plaintiff's second claim in this case is retaliatory discharge under 42 U.S.C. § 2000e-3. The Ninth Circuit held in *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727 (9th Cir.1986), that:

> To establish a prima facie case of discriminatory retaliation, a plaintiff must show that: (1) she engaged in an activity protected under Title VII; (2) her employer subjected her to adverse employment actions; (3) there was a causal link between the protected activity and the employer's action.

In retaliatory discharge cases, as in straight discrimination cases, once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nonretaliatory explanation, and then the burden shifts back to the plaintiff to show that the proffered explanation was merely a pretext. *Id.*

Before reciting the findings of fact, I will deal with the credibility of three individuals whose testimony differed on important matters.

A critical witness was the person who fired the plaintiff, Donald Powell. I listened carefully to Powell as he testified, observed him closely, and paid careful attention to the internal consistency of what he said, his consistency with other witnesses, and his consistency with common sense and ordinary experience. Based upon all these factors, I reached the conclusion that Powell recollected the events well and testified truthfully.

With regard to the plaintiff, I likewise listened to him carefully, and observed him closely, while applying the more objective tests to his testimony. I believed Powell and I could not believe him without disbelieving plaintiff, whose testimony flatly conflicted with Powell's. Moreover, it was my conclusion that on certain matters, on which findings are hereafter made contrary to his testimony, Matthews did not correctly observe, recollect and testify to the facts, perhaps in part because of the emotional turmoil experienced at the time of the events, and perhaps partly from family influences and the pressures of litigation.

There was extensive testimony that Matthews carried a notebook and took notes regarding the conditions of his employment. Matthews firmly denied maintaining the notebook or anything like it. There was nothing wrong with Matthews carrying and maintaining a notebook. Although such behavior might engender some defensiveness among his fellow employees and supervisors, he was entitled to keep a notebook. Based upon observation of his demeanor when he repeatedly denied keeping a notebook, I am convinced that the plaintiff lied about not keeping a notebook. There was inconsistency between his denial and his detailed notes in several of the exhibits regarding particular facts on particular days. Moreover, there was inconsistency between his testimony and the testimony of other witnesses. Certain time gaps in the plaintiff's handwritten notes suggest the possibility that he denied keeping a notebook because it appeared there were certain pages which he did not want to produce. No finding is made on that point, however, since it is not necessary in reaching a decision.

With regard to a third important witness, William Lemasters, I did not have the opportunity to watch and listen to Mr. Lemasters testify, but was limited to the record of his deposition and the impeachment testimony. I concluded that the testimony of Mr. William Lemasters with regard to the events was so confused as not to be credible. This may have been partly because of a head injury Lemasters suffered and partly because he bore an animus against Willis Enger. Enger formerly held Powell's position, and Lemasters thought that Enger, rather than Powell, had fired the plaintiff. He wished to testify against Enger.

## FINDINGS OF FACT

Based upon a preponderance evidence, the court finds as follows:

1. The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e–5(f).

2. The plaintiff has exhausted all administrative remedies required to be exhausted as a condition precedent to bringing this action.

3. Defendant North Slope Borough is an official instrumentality of local government within the state of Alaska.

4. The plaintiff Alphonso Matthews is black.

5. Plaintiff Alphonso Matthews was employed as a laborer by defendant North Slope Borough beginning July 12, 1982.

6. Matthews was terminated April 14, 1983.

7. On April 14, 1983, Donald Powell, a supervisor and an agent of the Borough, terminated Matthews from his employment.

8. Powell and the Borough did not discharge Matthews because of Matthews' race. Powell discharged Matthews for nondiscriminatory reasons.

9. The lack of further advancement and training resulted, not from Matthews' race, but from his poor performance and poor attitude.

10. Matthews did not perform his duties as a laborer satisfactorily.

11. Matthews was insubordinate to Powell.

12. When Matthews was ordered to chip ice from a doorway, he disobeyed Powell's instructions to use a pick and shovel and insisted on using power tools which took a much longer time and were not nearly as effective. He failed to complete the job in a reasonable time, wasted the time of other employees, and in the end

Powell had to complete the job with a pick and shovel.

13. Sandblasting is a two-man job, but when Matthews was assigned to help Lacey Warden do sandblasting, Matthews kept disappearing and leaving Warden alone. Warden complained to Powell.

14. Powell received complaints about Matthews' performance from other employees.

15. Powell had counseled Matthews privately in his office more than once about Matthews' attitude and work performance, before terminating him. He had given between eight and ten reprimands to Matthews.

16. Matthews' poor performance and poor attitude damaged morale in the shop.

17. Matthews gave considerable annoyance to a fellow employee by taking and wearing his personal shop coveralls, which could not be replaced locally, without permission, failing promptly to return them on demand, and treating the demand by the fellow employee for his coveralls with contempt. Matthews then caused Powell, the master mechanic who was the supervisor of the shop, to believe that Matthews was a liar, by giving Powell money to give to the complaining owner of the coveralls.

18. Matthews made other employees and supervisors think that he was intentionally delaying by spending over 15 minutes cleaning his goggles and by doing his sweeping in an extraordinarily slow manner.

19. The problem with Matthews was not so much that he was slow, although he was; there was not a great deal of time pressure at the work place. The problem was more that he was annoying, as by his odd way of sweeping, his refusal to use the pick and shovel his supervisor handed him to clean the ice and insistence on rigging up power tools, and most important, his going over his supervisor's head on the fuel truck pay dispute, leading to a change in procedures which caused extra effort for the supervisor and less money to his coworkers; he also ruined Nick Gueco's favorite coveralls which could not be replaced locally and then by his conduct led Powell to believe that he had stolen the coveralls. The irritation he engendered was not because he was black, but because he was troublesome in specific ways unrelated to race.

20. On the fuel truck incident, Bruce Roberts, in charge of pay, had put Matthews down for five hours, and Matthews wanted 11 hours, which would be a full ten-hour overtime shift plus an extra hour. Since Matthews had only worked for a half day, Powell decided he should be paid for half shift, plus half of the extra hour, so he told Roberts to add a half hour, making it 5.5 hours.

21. Matthews caused considerable annoyance to Powell by demanding that he be paid for a full day when he only worked a half day on the fuel truck, on the theory that if he had not been assigned to the fuel truck, he would have had a full day of work. As Powell saw it, on the Sunday about which Matthews had the pay dispute, Matthews only worked a half day, so should only get paid for a half day. This argument led Powell to take Matthews off fuel truck duty. Matthews alleges that this amounted to racially discriminatory denial of opportunities for advancement. The court finds that Powell's motives were not racially motivated. The court finds that Powell took Matthews off fuel truck duty because Powell was annoyed with Matthews for what he regarded as Matthews' unreasonable claim, doubly annoyed when Matthews went over his head to advance the claim unsuccessfully at a higher level in the Borough administration, and even more annoyed when the Borough administration responded by forbidding the practice of just paying an extra hour when employees were assigned to duties beyond their job description, so that Powell instead had to go through a great deal more paperwork in order to have flexibility in assignments.

22. Matthews accused Powell of racism over the fuel truck pay matter. Powell responded that his glasses could only see one color on the job, and that was "work-

er." Powell was sincere and honest in his denial of racial motivations.

23. When Powell told Matthews that he was a laborer and would remain a laborer, and Roberts responded to Matthews' demand for more overtime pay by saying that Matthews should be glad he received what he did, the responses were not based on Matthews' race, but on his annoying and troublemaking conduct regarding the extra pay for fueling.

24. Matthews' supervisors, Powell and Baldwin, did not use racially discriminatory procedures or criteria for evaluating Matthews.

25. The Borough did not retaliate against Matthews for any protected activity by Matthews.

26. The testimony that fellow employees called Matthews a "nigger," linking it with various obscenities and epithets, was credible. I find that these events did happen. But I do not find that this deplorable conduct by fellow employees led to Matthews' termination.

27. There was no testimony that Matthews advised Powell or any other appropriate authority of the racial slurs, and that they failed to do something about it, or retaliated against Matthews for reporting it. When Matthews complained about Willis Enger, Enger was first ordered to write up job descriptions on short notice, and was then fired. Though the question is close, I find that the North Slope Borough did not have knowledge of racial harassment of Matthews by his fellow employees such that the Borough would have an obligation to do something about it, and when the Borough did gain knowledge of legitimate complaints by Matthews, it responded effectively to his concerns. *Higgins v. Gates Rubber Co.*, 578 F.2d 281 (10th Cir.1978).

28. One set of facts troubles the court, but was not the basis for Matthews' claim, so is not the basis for relief. As noted, fellow employees of Matthews frequently called him "nigger". Sometimes when Matthews was pushing a broom in his peculiarly slow and inefficient manner, other employees would stand around watching him and making remarks such as "Look at how that nigger moves." When an especially unpleasant task falling within Matthews' job description had to be done, a previous supervisor made the remark, "Let the nigger do it." Plaintiff's duties included sweeping and picking up dirt and trash, cleaning water, snow and spills up from the floor of the shop, cleaning bathrooms, loading and unloading supplies, lifting and moving heavy objects and performing miscellaneous unskilled tasks.

The person who fired Matthews, Powell, and the individual with whom Matthews had the pay dispute, Roberts, did not call him "nigger," and the evidence does now show that they knew of this racial harassment by fellow employees. Mr. Powell takes pride in his fairness as a supervisor, his lack of racism, and reasonably fears that if he were regarded as a racist, it could impair his effectiveness as a construction crew supervisor. He takes pains to avoid any conduct which might smack of racism. The Borough cannot be charged with creating this hostile environment, since it was primarily low level employees who created it, and the supervisor who participated, Willis Enger, was fired. Nevertheless, the circumstances of the work place with regard to racism were disgraceful.

■ A claim of "hostile environment" race discrimination is actionable under Title VII. *Meritor Savings Bank v. Vinson,* — U.S. ——, 106 S.Ct. 2399, 2409, 91 L.Ed.2d 49 (1986). Matthews, however, has not established that the hostile environment led either to his poor performance or to his termination. Matthews performed his job despite the racist work environment, because he was getting paid very amply. His exhibit 52 showed three one-month periods at $9,934.82, $9,347.54 and $9,616.71 and one-half month period of $5,261.05. That yields an average pay of about $9,855.00 per month. The North Slope Borough, through Powell, fired Matthews for reasons entirely unrelated to the racism of some of Matthews' fellow employees.

29. Another issue which troubled the court, but which does not call for relief in the procedural context of this litigation, was the Borough's policy regarding tardiness and absence. The Borough required repeated reprimands before an employee was terminated for tardiness or absence. The reason for this was that tardiness and absence were common among the local, largely Eskimo population of the Borough. Other kinds of discipline violations were not the subject of any such leniency. Since this is a "disparate treatment" case, the court expressly does not reach any conclusion of law with regard to the legitimacy of the "disparate impact" of the discipline rules for Eskimo employees as against non-Eskimo employees. This lenient policy toward tardiness and absence was adopted in order to facilitate entry of the local Eskimo population into the wage economy, but it was applied in a racially neutral fashion, so that non-Eskimos received the same lenient treatment as Eskimos. Although absence and tardiness received progressive discipline, because part of the mission of the project was to train the local Eskimo population, there were other discipline infractions for which people of any race were fired on the spot and did not receive progressive discipline, such as drinking on the job and drugs on the job. The Borough policy was not applied in a manner which discriminated against Matthews because of his race.

### CONCLUSIONS OF LAW

1. The court has jurisdiction.

2. Defendant Borough did not discriminate against Matthews because of his race or retaliate against him because of a protected activity.

3. Accordingly, pursuant to Civil Rule 42, Matthews' action is dismissed with prejudice. The North Slope Borough is the prevailing party.